UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 11-65-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM** |
| ROBERT DALE LEE, | ) | **OPINION & ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Magistrate Judge Hanly A. Ingram has recommended that the Court grant Defendant Robert Dale Lee's motion to suppress because Drug Enforcement Agency (DEA) special agents illegally placed a GPS tracking device on his car. R. 33. The United States objects to that recommendation, arguing that Lee's arrest was too attenuated from the illegal search to justify suppression. R. 34. The United States also argues that the good-faith exception applies. *Id.* Because Lee's arrest stemmed directly from the illegal GPS search, and the DEA agents did not rely on binding appellate precedent, the Court will adopt Judge Ingram's recommendation and grant the motion to suppress.

## BACKGROUND

Judge Ingram's recommended disposition provides a detailed recitation of the facts, *see* R. 33 at 2-5, so the Court will only give a summary here.

Like many criminal investigations, this case started with a tip. A criminal defendant in another federal case wanted a reduced sentence for his drug trafficking charges, so he decided to cooperate with DEA agents. In December 2010, the cooperating defendant told

the DEA that he had purchased marijuana from Lee in the past. Lee was no stranger to federal law enforcement. In 2006, he was convicted of marijuana distribution and firearms possession and sentenced to 42 months in prison. *See United States v. Robert Dale Lee*, London Criminal No. 05-39(1)-KKC (E.D. Ky. Mar. 6, 2006), R. 22. The cooperating defendant also told the DEA agents that Lee obtained marijuana in Chicago and transported it back to eastern Kentucky in his car.

On September 2, 2011, Lee reported to the U.S. Probation Office in London, Kentucky, for the last day of his supervised release. But the end of Lee's supervision did not end law enforcement's interest in him. While Lee met with his probation officer, DEA Task Force Officer Brian Metzger secretly installed a Global Positioning System (GPS) tracking device on Lee's car. The tracking device, which had not been authorized by a judge, transmitted the location of Lee's vehicle to DEA agents in real time.

Three days after installing the tracking device, DEA agents noticed that Lee had driven to Chicago. On September 6, 2011, the agents saw Lee's vehicle moving south, back towards Kentucky. Suspecting that Lee had reverted to his old ways, Task Force Officer Metzger contacted Kentucky State Police Trooper Matt Hutti. He gave Hutti a description of Lee's car, told him that it "probably" contained marijuana, and told him that he "would have to obtain his own PC, probable cause, for a traffic stop." R. 33 at 3-4. When Lee reached Lexington, DEA agents began following his car and updated Hutti on his position. In the meantime, Hutti stationed himself along Interstate 75 in Mount Vernon with a canine unit to intercept Lee.

Hutti observed that Lee was not wearing a seatbelt as he drove past. He pulled Lee over and approached the car. Hutti noticed that Lee's hand was shaking uncontrollably, so he requested that Lee step out of the car and asked if Lee had any illegal contraband inside. Lee admitted to having two marijuana cigarettes and gave Hutti consent to search the car. By this point, another Kentucky State Police trooper, Jason McCowan, had arrived. Both Hutti and McCowan used their police dogs to search the exterior of the car for narcotics, and both dogs alerted to the presence of contraband. Hutti and McCowan then searched the interior of the car and found approximately 150 pounds of marijuana. Upon finding the drugs, the troopers arrested Lee.

Lee filed a motion to suppress the evidence and the statements he made after his arrest. R. 13. Magistrate Judge Ingram held a hearing on this motion on November 7, 2011, *see* R. 16; R. 18, and asked the parties to provide supplemental briefing following the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (Jan. 23, 2012); *see* R. 28. Judge Ingram recommended granting the motion to suppress. R. 33. The United States objected to that recommendation. R. 34.

## DISCUSSION

### I.     Timeliness

As a first matter, Lee argues that the United States failed to make a timely objection to Judge Ingram's recommendation. R. 35. Judge Ingram issued his recommendation on March 22, 2012, and informed the parties that they could object "within fourteen days after being served with a copy of this recommended decision" R. 33 at 27; *see* 28 U.S.C. § 636(b)(1) (giving parties fourteen days to object to a magistrate judge's recommendations);

Fed. R. Crim. P. 59(b)(2) (same).  The United States filed its objections fifteen days later, on April 6, 2012.  At first blush, the United States appears to be one day too late, and such tardiness would waive its right to object.  *See United States v. Campbell*, 261 F.3d 628, 631-32 (6th Cir. 2001).

That logic, however, assumes that the United States was served on the same day that Judge Ingram issued his recommendation.  Owing to a quirk of the Federal Rules, it was not. Under Federal Rule of Criminal Procedure 45(c), "[w]henever a party must act or may act within a specified period after service," and that service is accomplished by one of the means outlined in Federal Rule of Civil Procedure 5(b)(2)(C), (D), (E), or (F), "3 days are added after the period would otherwise expire."  This three-day extension is sensible for some forms of service.  Federal Rule of Civil Procedure 5(b)(2)(C), for example, allows service by mail to a person's last-known address, and the next subsection, Rule 5(b)(2)(D), permits service by leaving a document with the Clerk of the Court if the person has no known address.  In these situations, a few additional days may pass before the person receives the documents: mail can be slow, and not everyone can make an immediate trip to the Clerk's Office.

But Criminal Rule 45(c) also grants an additional three days for service accomplished by sending a document "by electronic means," including the "court's transmission facilities" if the local rules allow it.  *See* Fed. R. Civ. P. 5(b)(2)(E); *id*. 5(b)(3).  In the Eastern District of Kentucky, Local Criminal Rule 49.4 allows service through the court's Electronic Case Filing ("ECF") system, and Joint General Order Number 11-02 requires it.  Electronic filing has many virtues, and speed is among them.  As the Administrative Office of the Courts has

4

pointed out, ECF "greatly speeds delivery" of documents because parties receive e-mail notices of all new filings. Frequently Asked Questions, PACER, http://www.pacer.gov/psc/efaq.html#CMECF (follow "What are the benefits and features of using CM/ECF?" hyperlink), (last visited May 21, 2012). Nevertheless, under the Federal and Local Rules, parties are entitled to three extra days to act on documents they receive instantly. *See* Fed. R. Civ. P. 5(b)(2)(E); E.D. Ky. Joint General Order No. 11-02 ¶ 12.3 ("[S]ervice by electronic means is treated the same as service by mail for purposes of adding three (3) days to the prescribed period to respond."). Fourteen days from Judge Ingram's recommendation was April 5, and an additional three days extended the deadline for objections to April 8. Because that day was a Sunday, the United States had the right to object until Monday, April 9, 2012. *See* Fed. R. Crim. P. 45(a)(1)(C). Its objections were therefore timely.

## II.    Objections to the Recommended Disposition

The United States raises two objections to Judge Ingram's recommendation. It argues that the traffic stop was sufficiently attenuated from the illegal GPS search to expunge the taint of the illegal search, and even if it was not, that the officers acted in good faith. The Court reviews these objections *de novo*. *See* 28 U.S.C. § 636(b)(1).

### A.    Attenuation

Both Lee and the United States agree that, in light of *Jones*, the DEA agents performed an illegal search when they installed a GPS device on Lee's car. R. 33 at 6. That agreement does not, however, settle the matter because "[w]hether the exclusionary sanction is appropriately imposed in a particular case . . . is 'an issue separate from the question [of]

5

whether the Fourth Amendment rights of the party seeking to invoke the rule were violated by police conduct.'" *United States v. Leon*, 468 U.S. 897, 906 (1984) (quoting *Illinois v. Gates*, 462 U.S. 213, 223 (1983)). Under some circumstances, the causal connection between an illegal search and the incriminating evidence is "so attenuated as to dissipate the taint" of illegality, and the evidence should not be excluded. *Nardone v. United States*, 308 U.S. 338, 341 (1939) (Frankfurter, J.). In other cases, there is a direct causal connection between the search and the evidence, but "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence." *Hudson v. Michigan*, 547 U.S. 586, 593 (2006) (citing *New York v. Harris*, 495 U.S. 14 (1990)). To put it simply, "exclusion may not be premised on the mere fact that a constitutional violation was a 'but-for' cause of obtaining evidence," because "but-for causality is only a necessary, not a sufficient, condition for suppression." *Id.* at 592.

In this case, the parties disagree on whether the illegally placed GPS device was sufficiently connected to the evidence that Troopers Hutti and McCowan found during their stop of Lee's car. A three-factor test determines whether the connection between an illegal search and incriminating evidence is too attenuated: (1) the "temporal proximity" between the unlawful search and the police actions that uncovered the incriminating evidence; (2) whether there was an "intervening circumstance"; and (3) the "purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975). In his recommendation, Judge Ingram found that all three factors favored excluding the evidence against Lee. R. 33 at 12-19. The United States disagrees.

### 1) Temporal Proximity

The United States argues that the temporal proximity factor has neutral weight because of intervening circumstances. R. 34 at 2. Although temporal proximity might be less meaningful if an intervening circumstance occurs, this factor still favors exclusion. As Judge Ingram correctly noted, the use of a GPS device to monitor a vehicle's movement constitutes a search under *Jones*, 132 S. Ct. at 949, and the DEA agents used data from the GPS tracker to inform the Kentucky State Police where and when Lee would be traveling shortly before Trooper Hutti stopped him. R. 33 at 12-13. The short time period between the unlawful search and the incriminating evidence is an indication that the taint of illegality had not yet dissipated, so this factor does not favor attenuation.

### 2) Intervening Circumstances

No intervening circumstance severed the illegal search in this case from the incriminating evidence. Relying on *United States v. Lopez*, No. 10-67-GMS, 2011 WL 2636890 (D. Del. July 6, 2011), the United States argues that an independent traffic stop can break the chain of causation between an illegal search and incriminating evidence. R. 34 at 4. That may be so, but only if the traffic stop is independent from the illegal search. In *Lopez*, Wilmington, Delaware, police officers suspected the defendant of selling heroin, so they placed a GPS tracking device on his vehicle without a warrant. 2011 WL 2636890, at *1. While the Wilmington police were following his movements, Lopez began driving recklessly, and a patrol officer who was unconnected with the investigation observed him speeding by at 91 miles per hour in a 55-mile-per-hour zone. That officer pulled Lopez over, smelled burning marijuana, and returned to his cruiser to request assistance. At that point,

the Wilmington police arrived, searched Lopez's vehicle, and found a significant quantity of heroin. *Id*. at *3-4. Despite the Wilmington police's illegal GPS tracking, Lopez's speeding—as observed by an officer not connected to the investigation—was an intervening circumstance. *Id*. at *5.

By contrast, in this case, Task Force Officer Metzger informed Trooper Hutti that Lee was "probably" transporting drugs, told him to "obtain his own PC, probable cause, for a traffic stop," and updated him on Lee's whereabouts. R. 33 at 3-4. All of that information was based on the illegal search. Without the GPS tracking data, the DEA agents would not have known that Lee traveled to Chicago (his source for drugs), that he was returning to Kentucky along I-75, or his exact position. As a result, Judge Ingram reasoned that the causal connection between the illegal search and the traffic stop remained intact. *See* R. 33 at 17.

Judge Ingram's conclusion is also supported by the Sixth Circuit's binding decision in *United States v. Gross*, 662 F.3d 393, 405 (6th Cir. 2011). In that case, a police officer made an illegal stop of an individual in a high-crime neighborhood. *Id.* at 396. In the course of the stop, the officer discovered that the individual was breaking state open-container laws and had an outstanding warrant. *Id.* at 397. An open-container violation and the discovery of an outstanding warrant might, under some circumstances, count as intervening events. But the Sixth Circuit held that they did not break the chain of causation because the officer would never have been in a position to discover the new violations without first performing an illegal stop. *Id.* at 405 (reasoning that the defendant's detention was not justified by the open-container citation because the detention was "actually a continuation of the illegal

seizure"). The same analysis applies here: Trooper Hutti's ability to observe the seatbelt violation was clearly related to the illegal search. Without the information gained by the illegal GPS tracking, Hutti would not have known where to find Lee, when to find him there, or that he should "develop" probable cause to stop him. As a result, the seatbelt violation was not a "new, distinct crime" that could establish attenuation. *Id.* (quoting *United States v. Castillo*, 238 F.3d 424, 2000 WL 1800481, at *6 (6th Cir. 2000) (unpublished table decision)).

In its objections, the United States also raises the possibility that the dog searches and Lee's confession could be intervening circumstances. R. 34 at 4. Those events could, in some contexts, sever the chain of causation stemming from an illegal search. *See, e.g.*, *United States v. Ceccolini*, 435 U.S. 268, 279, (1978) (holding a witness's testimony admissible because it derived from a police interview of her and was in no way connected to an illegal search of the defendant's business four months earlier); *Wong Sun v. United States*, 371 U.S. 471, 491 (1963) (holding a defendant's confession admissible, despite the fact that his arrest was unlawful, because he confessed upon voluntarily returning to the police station several days after being lawfully arraigned and released on personal recognizance); *United States v. Pearce*, 531 F.3d 374, 382 n.2 (6th Cir. 2008) (holding that even if an officer's stop of a defendant, who was on foot, was unlawful, the search of a parked car was justified by a different officer observing a gun magazine in plain view in the car). The dog search and confession are not, however, sufficient to create an intervening circumstance here. Troopers Hutti and McCowan brought drug-sniffing dogs with them because the DEA agents told them (based on their illegal search) that Lee was likely to have marijuana in his car.

Likewise, Lee confessed only after the dogs alerted and the officers found the marijuana in his car. His confession was the direct result of the traffic stop and the search. *Cf. Ceccolini*, 435 U.S. at 279 (confession severed from search that occurred four months earlier); *Wong Sun*, 371 U.S. at 491 (confession severed from unlawful arrest when the defendant voluntarily returned to the police station). These events did not dissipate the taint of the illegal GPS tracking.

### 3) Purpose and Flagrancy of Official Misconduct

Finally, the "purpose and flagrancy of the official misconduct" weighs against attenuation. *Brown*, 422 U.S. at 604. This last factor is often the "most important," *United States v. Shaw*, 464 F.3d 615, 630 (6th Cir. 2006), because "[t]he primary focus of attenuation analysis is whether or not the deterrent purpose of the exclusionary rule is served by suppression," *United States v. Gray*, 491 F.3d 138, 155 (4th Cir. 2007) (Wilkinson, J.). Although the DEA agents' misconduct was not flagrant, the Sixth Circuit has explained that police officers act with an unlawful purpose when they perform an "investigatory" search, that is, "when officers unlawfully seize a defendant 'in the hope that something might turn up.'" *United States v. Williams*, 615 F.3d 657, 670 (6th Cir. 2010) (quoting *Brown*, 422 U.S. at 605); *see also Shaw*, 464 F.3d at 631 (noting that "*Brown* made it clear that the requisite 'quality of purposefulness' can be demonstrated when the [misconduct], in design and execution, is investigatory in nature"). The Seventh Circuit agrees that an illegal search has an unlawful purpose when it is "undertaken in an effort to advance the investigation or to embark on a fishing expedition." *United States v. Reed*, 349 F.3d 457, 465 (7th Cir. 2003).

In this case, the DEA agents had their fishing poles out to catch Lee. Admittedly, the agents did not intend to break the law. But they installed a GPS device on Lee's car without a warrant "in the hope that something might turn up." *Williams*, 615 F.3d at 670. (quoting *Brown*, 422 U.S. at 605). When suspicious behavior did, in fact, turn up, they alerted the Kentucky State Police. By doing so, they set in motion a chain of events that ended with Lee's arrest. Their unlawful purpose means that the third attenuation factor also weighs in favor of suppression.

Moreover, the *Gross* panel pointed out that allowing "post-hoc rationalization" by police would create the "perverse" incentive for police officers to detain any individual going about their daily routines in the hope of turning up an outstanding warrant. *Gross*, 662 F.3d at 405. The same perverse incentive is present here: if Lee's seatbelt violation were an intervening circumstance, police could install tracking devices with impunity so long as they waited until the subject of their surveillance commits a minor traffic violation. *Accord Maryland v. Wilson*, 519 U.S. 408, 423 (1997) (Kennedy, J., dissenting) (describing the "almost countless circumstances" that allow the police to stop a vehicle). At that point, the police could stop them and search for evidence of illegal activity. Thus, the Court agrees with Judge Ingram that the police misconduct was guided by an impermissible purpose. *See* R. 33 at 16. Because none of the three factors favor attenuation, the Court must suppress all evidence that derived from Metzger's illegal search, including the traffic stop, the search of Lee's car, and his subsequent confession.

## B. Good-Faith Exception

Even if suppression is justified, courts carve out a "good faith" exception from suppression for "objectively reasonable law enforcement activity." *Davis v. United States*, 131 S. Ct. 2419, 2429 (2011). The rationale behind this exception is that "the harsh sanction of exclusion" will not deter officers who "act as a reasonable officer would and should act under the circumstances." *Id.* (internal quotation omitted). In its objection, the United States argues that the agents "carefully followed national [DEA] policy and precedent by attaching the [GPS] device in a public place and then by only monitoring what Lee held out to the general public as he traveled up and down Interstate 75." R. 34 at 8.

That argument is factually correct, but legally irrelevant. Task Force Office Metzger undoubtedly believed he was acting within the confines of the law when he placed the GPS device on Lee's car. He followed the policy created by his superiors, just as any police officer should. Common parlance might even describe him as acting in "good faith." But oftentimes the legal meaning of a phrase varies from its common usage. For example, an ordinary person would likely say that someone who keeps a gun in the trunk of his car does not "carry" that gun. *See, e.g.*, Merriam-Webster's Collegiate Dictionary 175 (10th ed. 1999) ("to move while supporting"); *United States v. Foster*, 133 F.3d 704, 705 (9th Cir. 1998) (en banc) (Kozinski, J.) ("If I were to say 'Don Corleone is carrying a gun'—or even just 'Don Corleone is carrying'—you would understand that the Don has a sidearm somewhere on his person."), *vacated by Muscarello v. United States*, 524 U.S. 125 (1998). But the Supreme Court has ruled that a drug dealer who keeps a gun in his trunk "uses or carries" that firearm and therefore receives five extra years in prison under 18 U.S.C.

§ 924(c)(1).  *Muscarello*, 524 U.S. at 126-27.  "Good faith" is much the same.  In everyday conversation, a person might say that the DEA agents in this case acted in good faith: they obeyed their agency's national policy and thought they were following the law.  But legally, the good-faith exception does not apply whenever police officers believe they are following the law.

Rather, the good-faith exception only protects conduct that is "objectively reasonable."  *Leon*, 468 U.S. at 919.  When does police conduct meet this standard?  In general, only when an (ultimately incorrect) legal authority approved of the officers' actions.  Thus, the Supreme Court has applied the good-faith exception to warrants that were later found to be invalid, *see id*. at 906, statutes that were later declared unconstitutional, *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987), erroneous information in databases of outstanding warrants, *Herring v. United States*, 555 U.S. 135, 145 (2009); *Arizona v. Evans*, 514 U.S. 1, 14 (1995), and, most recently, "binding appellate precedent" that is later overturned, *Davis*, 131 S. Ct. at 2428.  In all of these circumstances, a legal authority in the relevant jurisdiction—a magistrate, legislature, court employee, or appellate panel—provides its imprimatur for the search.  If that authority's judgment is later overturned, the good-faith exception gives police officers a safe harbor.  After all, police officers are not expected to have a comprehensive knowledge of the law, so they may reasonably rely on the decision of a judge or the actions of a legislature.  The deterrence rationale "loses much of its force" in these contexts because police must rely on legal authorities, even when those authorities are ultimately incorrect.  *Leon*, 468 U.S. at 919 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)).  The police officer who carries out an illegal search based on a faulty warrant

will not change his behavior in the future. He has no choice but to rely on magistrates for warrants. And short of obtaining legal expertise, he has no independent ability to verify a warrant's validity.

Binding appellate precedent is much the same: police "ac[t] as a reasonable officer would and should act" when they carry out a search based on a binding decision by their state's supreme court or the relevant federal court of appeals. *Davis*, 131 S. Ct. at 2429 (quoting *Leon*, 468 U.S. at 920). Before the Supreme Court's *Davis* decision, the Sixth Circuit also emphasized that "precedent on a given point must be unequivocal" to suspend the exclusionary rule. *United States v. Buford*, 632 F.3d 264, 276 n.9 (6th Cir. 2011) (quoting *United States v. Davis*, 598 F.3d 1259, 1266 (11th Cir. 2011)). And the Sixth Circuit was not alone. Other courts of appeals that considered this issue before *Davis* also limited the good-faith exception to binding appellate precedent. *See Davis*, 598 F.3d at 1266; *United States v. McCane*, 573 F.3d 1037, 1045 n.6 (10th Cir. 2009) (applying the good-faith exception because "the Tenth Circuit jurisprudence supporting the search was settled"); *United States v. Jackson*, 825 F.3d 853, 866 (5th Cir. 1987) (holding that the exclusionary rule "should not be applied to searches which relied on Fifth Circuit law" that was subsequently overturned); *cf. United States v. Real Prop. Located at 15324 Cnty. Highway E*, 332 F.3d 1070, 1075-76 (7th Cir. 2003) (expressing concern that an extension of the good-faith exception to subsequently overruled case law might be "an implicit invitation to officers in the field to engage in the tasks—better left to the judiciary and members of the bar more generally—of legal research and analysis").

This Court is also not the first district court to confront the question of whether to apply the good-faith exception after *Jones*.  In the Ninth Circuit, where binding circuit precedent authorized warrantless GPS monitoring, three district courts have applied the good-faith exception to defeat the defendant's motion to suppress.  *United States v. Aquilar*, No. 4:11-cr-298-BLW, 2012 WL 1600276, at *2 (D. Idaho May 7, 2012); *United States v. Leon*, No. CR 09-00452, 2012 WL 1081962, at *3 (D. Haw. Mar. 28, 2012); *United States v. Nwobi*, No. CR 10-952(C)GHK-7, 2012 WL 769746, at *3 (C.D. Cal. Mar. 7, 2012).  A district court in the Eighth Circuit did the same, also holding that the officer's reliance on binding circuit precedent triggered the good-faith exception.  *United States v. Amaya*, No. CR-11-4065-MWB, 2012 WL 1188456, at *7-8 (N.D. Iowa Apr. 10, 2012).[1]  But in the Third Circuit, where there was no appellate ruling on warrantless GPS tracking, one district court refused to extend the good-faith exception.  *United States v. Katzin*, No. 11-226, 2012 WL 1646894, at *9-10 (E.D. Pa. May 9, 2012).  Applying the good-faith exception in the absence of binding appellate precedent would, in that court's eyes, "effectively eviscerate the exclusionary rule."  *Id.* at *9.  If law enforcement could "rely on non-binding authority, particularly in the face of other, contrary non-binding authority," officers would "beg forgiveness rather than ask permission in ambiguous situations involving . . . basic civil rights."  *Id.*

---

[1] Despite finding that the good-faith exception applied to a DEA agent's conduct because he relied on binding Eighth Circuit precedent, the *Amaya* court initially sanctioned that same agent for submitting an affidavit in discovery that failed to disclose the GPS tracking.  2012 WL 1188456 at *9.  That court later withdrew the sanctions.  *See* 2012 WL 1523045 (May 1, 2012). But a paradox remains: the DEA agent in *Amaya* violated the common-sense understanding of good faith while qualifying for the Fourth Amendment's "good-faith exception."  By contrast, the DEA agents in this case acted in good faith under a common understanding of the phrase, yet do not qualify for the "good-faith exception."

Indeed, extending the good-faith exception would give police "little incentive to err on the side of constitutional behavior." *Davis*, 131 S. Ct. at 2435 (Sotomayor, J., concurring) (quoting *United States v. Johnson*, 457 U.S. 537, 561 (1982)). If a police officer conducts a search based on a non-binding judicial decision—that is, an opinion by a trial court, an unpublished opinion by his own circuit's court of appeals, or a published opinion by another circuit's court of appeals—he is guessing at what the law might be, rather than relying on what a binding legal authority tells him it is. When a police officer follows binding law, suppression can only "discourage the officer from 'doing his duty.'" *Davis*, 131 S Ct. at 2429 (quoting *Leon*, 468 U.S. at 920). But suppression might deter the officer who picks and chooses which law he wishes to follow. *Cf. Davis*, 131 S. Ct. at 2435 (Sotomayor, J., concurring) ("[W]hen police decide to conduct a search or seize in the absence of case law (or other authority) specifically sanctioning such action, exclusion of the evidence obtained may deter Fourth Amendment violations.").

Limiting the good-faith exception to binding appellate precedent also promotes the "essential interest in readily administrable rules" to govern police. *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001). When carrying out searches, federal officers need only know the binding decisions of the Supreme Court and their circuit's court of appeals. Conversely, expanding the exception to non-binding authority raises a host of questions. How many circuits must support a practice before an officer can rely on it in good faith? Two? Four? A majority? What if the judges on one panel are particularly well-respected? What if others are not? And what if several district courts, but no courts of appeals, support a practice? Allowing officers to rely on non-binding authority raises all of these questions,

but answers none of them. In theory, courts could impose a minimum quantity of non-binding authority before the good-faith exception applied—say, half of the courts of appeals. But why are seven courts of appeals necessarily more persuasive than six? Such a minimum would be nothing more than an arbitrary rule, plucked from thin air. *Cf. Maryland v. Shatzer*, 130 S. Ct. 1213, 1228 (2010) (Thomas, J., concurring) ("[A]n otherwise arbitrary rule is not justifiable merely because it gives clear instruction to law enforcement officers."). Binding appellate precedent, on the other hand, is a simple limit that hews to the Supreme Court's *Davis* decision.

The DEA agents in this case did not rely on any binding appellate precedent. Neither the Sixth Circuit nor the Supreme Court had spoken on the issue of GPS surveillance when the agents placed the tracking device on Lee's car. Instead, they followed a national DEA policy. To the agents' credit, by September 2011, several courts of appeals had upheld the constitutionality of warrantless GPS tracking. *See United States v. Hernandez*, No. 10-10695, 2011 WL 2750914, at *2 (5th Cir. July 18, 2011); *United States v. Marquez*, 605 F.3d 604 (8th Cir. 2010); *United States v. Garcia*, 474 F.3d 994 (7th Cir. 2007); *United States v. McIver*, 186 F.3d 1119, 1127 (9th Cir. 1999). But one circuit had disagreed and held that GPS tracking did require a warrant. *United States v. Maynard*, 615 F.3d 544, 560 (D.C. Cir. 2010). Unlike the officers in *Davis*, who "scrupulously adhered to governing law," the DEA agents in this case relied on no binding precedent. Instead, they relied on a national DEA policy. Again, the Court does not intend to disparage the DEA agents for following a policy crafted by their superiors. But that policy guessed—incorrectly—at how the Supreme Court might resolve an unsettled question of Fourth Amendment law. In the Fifth, Seventh, Eighth,

or Ninth Circuits, that national policy was supported by binding appellate precedent. But in the Sixth, it was not. As a result, the DEA agents in this case did not act within the confines of the good-faith exception.

In attempt to salvage the search, the United States also argues that the DEA agents acted in reliance on the Sixth Circuit's opinion in *United States v. Forest*, 355 F.3d 942, 951 (6th Cir. 2004), *abrogated on other grounds by United States v. Booker*, 543 U.S. 220 (2005). Yet as Judge Ingram correctly noted, *Forest* only approved the warrantless use of data from cell phone towers to track movements on public highways. R. 33 at 24. In that case, DEA agents repeatedly dialed the defendant's cell phone, causing the phone to transmit its location to cell phone towers. *Forest*, 355 F.3d at 947.

Under even the narrowest reading of *Jones*, "[w]hen the government physically invades personal property to gather information, a search occurs." 132 S. Ct. at 955 (Sotomayor, J., concurring). The United States does not dispute that Task Force Officer Metzger physically invaded Lee's property when he placed the GPS tracker on Lee's car. That physical invasion was a trespass, and that trespass continued while the device transmitted information to the DEA agents. *Forest*, by contrast, did not involve a physical trespass. Its holding is thus more similar to those of *United States v. Knotts*, 460 U.S. 276, 282 (1983) (officers did not commit a search when they tracked a "beeper" in a container of chemicals with the owner's consent) and *United States v. Karo*, 468 U.S. 705 (1984) (officers did not commit a search when they installed a beeper onto a container with the owner's consent). *Jones* expressly distinguished those cases because they did not involve a physical trespass. *Jones*, 132 S. Ct. at 952. *Forest* is similarly distinguishable. Even though

the DEA agents could have determined Lee's location through cell phone data under *Forest*, they could not obtain that same information through an illegally placed GPS device under *Jones*. As a result, the DEA agents could not have relied on *Forest* as binding appellate precedent to trigger the good-faith exception.

## CONCLUSION

Judge Ingram correctly determined that the DEA agents performed an illegal search when they installed a GPS tracking device on Lee's car without a warrant. The stop by the Kentucky State Police, the search of Lee's car, and his subsequent confession were all tainted by that search. And because the DEA agents did not rely on binding appellate precedent, the good-faith exception cannot apply. Accordingly, it is **ORDERED** that Judge Ingram's recommended disposition, R. 33, is **ADOPTED** as the opinion of the Court. It is further **ORDERED** that Lee's motion to suppress, R. 13, is **GRANTED**.

This the 22nd day of May, 2012.

Signed By:

*Amul R. Thapar*

United States District Judge